# In the United States Court of Federal Claims
No. 23-563

(Filed under seal: July 12, 2023)
(Reissued: July 21, 2023)

|  |  |
|---|---|
| **HARMONIA HOLDINGS GROUP, LLC,** | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| **UNITED STATES,** | ) ) ) |
| Defendant, | ) ) ) |
| **and** | ) ) ) |
| **HALVIK CORP.,** | ) ) ) |
| Defendant-intervenor. | ) ) |

    Jon D. Levin, Maynard Nexsen P.C., Huntsville, Alabama, for plaintiff.  With him on the briefs were W. Brad English, Emily J. Chancey, and Nicholas P. Greer, Maynard Nexsen P.C., Huntsville, Alabama.

    Jana Moses, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  Appearing with her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, Patricia M. McCarthy, Director, and William J Grimaldi, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. and Alissa M. Dolan and Anastasiya Sidorova, Attorney Advisors, Office of Chief Counsel, Department of Transportation, Federal Highway Administration.

    Alexander J. Brittin, Brittin Law Group PLLC, Washington, D.C., for defendant-intervenor, Halvik Corp.  With him on the briefs was Mary Pat Buckenmeyer, Dunlap Bennett & Ludwig PLLC, Vienna, Virginia.

**OPINION AND ORDER**[1]

LETTOW, Senior Judge.

Pending before this court in this post-award bid protest is plaintiff Harmonia Holdings Group, LLC's ("Harmonia's") motion for a preliminary injunction. *See* Harmonia's Restated Mot. for Prelim. Inj. and Incorporated Br. ("Pl.'s Mot. for Prelim. Inj."), ECF No. 26. Harmonia filed suit in this court on April 21, 2023 protesting the United States Department of Transportation's ("DOT's") evaluation and award to Halvik Corp. ("Halvik") of a solicitation "to maintain and update the Federal Railroad Administration's ("FRA's") public data website." Compl. ¶ 14, ECF No. 1. The solicitation, request for quotation number 693JJ323Q000009, sought quotations under Federal Acquisition Regulation ("FAR") Subpart 8.4. More specifically, it sought quotations under an established software engineering services Blanket Purchase Agreement ("BPA") for an award of a 12-month firm-fixed task order. Compl. ¶¶ 1, 14-15. The Department of Transportation issued the solicitation on November 8, 2022 and amended its solicitation approximately one week later on November 16, 2022. Compl. ¶¶ 14, 17. Harmonia submitted its bid on November 23, 2022. Compl. ¶ 8. Between four and five months after submitting its bid, on April 10, 2023, Harmonia asked DOT for an update on the status of the procurement, and DOT responded that it had awarded the contract to Halvik in December 2022. *See* Compl. ¶¶ 9-10, 32. Harmonia filed its complaint and initial motion for preliminary injunction in this court on April 21, 2023 and on April 24, 2024, respectively. Compl.; Harmonia's Mot. for Prelim. Inj. and Incorporated Br., ECF No. 12.[2] Halvik also filed its unopposed motion to intervene on April 24, 2023, which the court granted. *See* Halvik's Unopposed Mot. to Intervene, ECF No. 10; Order of Apr. 24, 2023, ECF No. 13. On April 26, 2023, the court held an initial status conference and issued a scheduling order for the government's filing of the administrative record and Harmonia's motion for a preliminary injunction. *See* Scheduling Order of Apr. 26, 2023, ECF No. 23. The court ordered that Harmonia's restated motion for a preliminary injunction, which it ultimately filed on May 19, 2023, would replace its earlier motion. *See id.* at 1; Pl.'s Mot. for Prelim. Inj. at 1. In its pending motion, Harmonia requests that the court prohibit DOT "from making [an] award under [the solicitation]" and from allowing "performance of the contract under the [s]olicitation" during the protest. Pl.'s Mot. for Prelim. Inj. at 1, 27.[3]

---

[1] The parties were requested to provide proposed redactions by July 18, 2023. Redactions were proposed, many, but not all, of which were accepted by the court. Redactions are shown by asterisks enclosed by brackets, *e.g.*, "[***]."

[2] Along with its complaint, Harmonia filed its motion for leave to file its complaint under seal and its motion for a protective order. Pl.'s Mot. for Leave to File under Seal, ECF No. 4; Pl.'s Mot. for a Protective Order, ECF No. 3. The court granted both motions. Order of Apr. 21, 2023, ECF No. 9; Order of Apr. 24, 2023, ECF No. 15.

[3] As discussed with the parties during the hearing on June 15, 2023 regarding the motion for a preliminary injunction, the court notes that DOT awarded the contract to Halvik, which has been performing the contract for over six months. *See* Hr'g Tr. 7:22 to 9:10 (June 15, 2023), ECF No. 33. Harmonia stated that a preliminary injunction would prohibit Halvik's performance of the contract and that ultimately Harmonia would seek permanent injunctive relief. *See* Hr'g Tr. 8:24 to 9:10 (June 15, 2023).

The government responded to Harmonia's motion on June 2, 2023.  Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Resp."), ECF No. 28.  Also on June 2, 2023, intervenor Halvik filed a document both responding to plaintiff's motion for a preliminary injunction and moving to dismiss the case as barred under the doctrine of laches.  Intervenor Halvik's Mot. to Dismiss and Resp. to Pl.'s Restated Mot. for Prelim. Inj. ("Def.-Intervenor Halvik's Resp."), ECF No. 27.  In its filing, Halvik requested that the court allow full performance of the contract during the pendency of the protest.  *Id*. at 21.  Harmonia replied on June 9, 2023 and the court held a hearing on the motion on June 15, 2023.  Harmonia's Reply in Supp. of its Restated Mot. for Prelim. Inj. ("Pl.'s Reply"), ECF No. 30; Hr'g Tr. 1:17-19 (June 15, 2023); *see* Scheduling Order of June 8, 2023, ECF No. 29.  After the hearing, Halvik filed a notice of its progress of performance under the procurement.  Def.-Intervenor Halvik's Notice, ECF No. 31.

The motion is fully briefed and ready for disposition.  For the reasons stated, defendant-intervenor's motion to dismiss and plaintiff's motion for a preliminary injunction are both DENIED.

**BACKGROUND**

*A.  Solicitation*

On November 8, 2022, per FAR Subpart 8.405-3, DOT's Federal Highway Administration issued a request for quotation (or solicitation) under an existing software engineering support BPA.  *See* AR 54, 78.[4]  The solicitation sought quotations for an award of a 12-month firm-fixed task order to provide support services to FRA for its safety data websites.  *See* AR 54, 82-89.  The safety data websites provide access to critical transportation safety data.  This data in turn can be used for emergency orders, safety advisories, regulations, and other measures to further safety in the rail industry.  Decl. of Dan Morgan ¶ 7 (May 31, 2023), ECF No. 28 Aff. 1.[5]

On November 16, 2022, DOT amended the solicitation to provide and incorporate the government's responses to questions and extend the submission period from November 21, 2022 to November 23, 2022.  *See* AR 103-04.[6]  Per the amendment, the solicitation closed on November 23, 2022.  AR 103.

---

[4] The administrative record is paginated consecutively and will be cited as "AR __."

[5] Defendant attached a declaration from Dan Morgan, DOT's chief data officer, to its response to Harmonia's motion for preliminary injunction.  The declaration discusses the data safety website and the purpose of the work under this solicitation.  *See generally* Decl. of Dan Morgan (May 31, 2023).

[6] The solicitation was amended to "[p]rovide [g]overnment response[s] to the questions …, and 3) [e]xtend the quotation submission timeline from November 21, 2022 to Wed[nesday], November 23, 2022 at 12:00 PM ET.  All other terms and conditions of the original [request for quotation] remain[ed] unchanged." AR 103.  One change to incorporate the government's

The awardee maintaining and updating the FRA's website would be responsible for "project management, development, data architecture (data schema, database), design, and testing of the current public and secure site content, as well as the transfer, integration, and decommission for the legacy public and secure websites." AR 133. The awardee would work alongside a team from Tyler Technologies and the DOT Web team that was also working on this project. *See* AR 132 ("Three teams are working to meet the goals . . . [:] [t]he team working under this [statement of work], [a] team of Tyler Technologies professional services personnel supporting use of the Data & Insights (formerly Socrata) platform, [and] [t]he DOT Web team, operating the Acquia Drupal content management system.").

### B. Evaluation Criteria

The Department of Transportation would evaluate quotations based on three non-price factors and one price factor and ultimately make a best-value based award. AR 128-29. The three non-price evaluation factors were 1) Technical Capability Statement, 2) Staffing Approach, and 3) Corporate Experience. AR 128-29. Each non-price factor would be given a high confidence, some confidence, or low confidence rating, depending on the confidence that the

---

responses to the questions was adding a list of technologies that the task order involved, including "Tyler Technologies Data & Insights (formerly Socrata)," and noting that "[a] technology change is not anticipated under the current scope." AR 106. Another change to incorporate the government's responses was under the evaluation factor "Technical Capability Statement." *See* AR 124, 128. Under this factor the government added a parenthetical to the sub-factor "Development, Modernization[,] and Enhancement" stating "(e.g., the FRA data warehouse and the Tyler Technologies Data & Insights platform)." AR 124, 128-29. Additional changes included listing the use of Socrata in the contract, explaining further the work of maintaining, updating, and enhancing the website, describing the Socrata datasets, and adding the assumption that "[t]he government is providing for an overlap and knowledge transfer to occur in December 2022." *See* AR 132-34, 136-37, 139.

The statement of work for the task order stated that

> [t]his contract primarily cover[s] the maintenance and updates of the content of the current public and secure websites and the decommission of the legacy public and secure websites. The other contracts primarily cover (1) Drupal maintenance and (2) Socrata development. The selected contractor for this task is responsible for the maintenance of the existing content, including reports, websites, PDF functionality and a data warehouse. Maintenance includes providing updates and enhancements, as requested. So, while the work is complete and is in (or will be in) maintenance mode, the [subject matter expert] is required to have experience in warehouse development, technical architecture, development, and data infrastructure activities to be able to maintain and update. The government will make decisions to maintain or update during the contract; it is not already pre-determined.

AR 309.

government had in the offeror successfully performing the solicitation's requirements and the level of government intervention that DOT anticipated would be required.  AR 130.[7]  The contract would be awarded to the bidder that offered the best value for DOT.  AR 128.  The best-value decision utilized a trade-off analysis.  AR 128.  In this trade-off analysis, the three non-price factors (Technical Capability Statement, Staffing Approach, and Corporate Experience) were of descending importance and the three non-price factors combined were more important than the one price factor.  AR 128.

While the three non-price factors were assigned a high confidence, some confidence, or low confidence rating overall, each non-price factor also had subfactors that were used to evaluate them or further descriptions of how they should be evaluated.  AR 128-30.  First, the Technical Capability Statement factor was evaluated based on five sub-factors.  The five Technical Capability Statement sub-factors were: 1) "Project Management: Strategy to manage multiple objectives with a cross functional team and assess the team effectiveness[,]" 2) "Environments: Strategy to create/maintain various system instances (Development, Stage[,] and Production) and promoting an application or application component from one instance to other instance while monitoring system instances health[,]" 3) "Quality: Explain how the offeror will develop, implement, and control a quality management system to enforce standardization, ensure reliability of components and dependent components, and enable scalability as data only grows over time[,]" 4) "Development, Modernization[,] and Enhancement: Strategy to maintain high quality dashboards and data from current systems as files generated through extract, transform[,] and load scripting or through APIs to other systems (e.g., The FRA data warehouse and the Tyler Technologies Data & Insights platform)[,]" and 5) "Operations and Maintenance: Transition-in Strategy to inherit the existing dashboards, data[,] and code and provide support."  AR 128-29.[8]  Second, the Staffing Approach factor was described in one paragraph, stating that DOT would

---

[7] The solicitation stated that non-price factors are designated as 1) "High Confidence" when "[t]he [g]overnment has *high confidence* that the [o]fferor understands the requirement, proposes a sound approach and strategy, and will be successful in performing the contract with *little or no* [g]overnment intervention," as 2) "Some Confidence" when "[t]he [g]overnment has *some confidence* that the [o]fferor understands the requirement, proposes a sound approach and strategy, and will be successful in performing the contract with *some* [g]overnment intervention," and as 3) "Low Confidence" when "[t]he [g]overnment has *low confidence* that the [o]fferor understands the requirement, proposes a sound approach and strategy, or will be successful in performing the contract *even with* [g]overnment intervention."  AR 130.

[8] Before amending its solicitation, DOT answered a question about knowledge of existing systems and data.  *See* AR 153.  The questioner asked: "The deliverables appear to involve a considerable knowledge of existing systems and data.  For success of this task order, and pertaining to award selection criteria, would the government please identify the weighting and/or rate previous knowledge of this project?"  AR 153.  The government answered that it was "providing for an overlap and knowledge transfer to occur in December 2022."  AR 153.  Relatedly, when DOT amended the solicitation, it added "[t]he government is providing for an overlap and knowledge transfer to occur in December 2022" to its list of assumptions.  *See* AR 139.

"determine if [the offeror] ha[d] the appropriate labor categories, mix of labor, and level of effort" to carry out the requirements. AR 129. Third, the Corporate Experience factor also was described in one paragraph. It stated that DOT would evaluate "examples of recent and relevant corporate experience providing services similar in size and complexity to the requirements of the solicitation." AR 129. The paragraph defined "recent experience" as "relevant experience performed anytime within three (3) years from the date of the issuance of th[e] [request for quotations]." *Id.* It defined "relevant experience" as "experience where the [o]fferor has performed the same or similar work as the requirements of this solicitation and [the statement of work]." *Id.* It also directed offerors to provide "at least two (2) [examples] as the prime contractor, and no more than three (3) total examples of corporate experience. *Id.*

The Department of Transportation would also evaluate if the offerors' price was fair and reasonable. It directed offerors to calculate and submit their price using the Price Model and Firm-Fixed Price Contract Line Item Number Structure (referred to as the CLIN Structure) attachment that DOT provided. AR 129.

### C. Submissions and Award to Halvik

Three companies, Harmonia, Halvik, and [***], submitted quotations to the solicitation. AR 154-80, 182-212, 214-40. Each submitted their bids on or before November 23, 2022, when the solicitation closed. *See* AR 103, 249. The Technical Evaluation Panel evaluated the three non-price factors (Technical Capability Statement, Staffing Approach, and Corporate Experience) for each offeror. AR 245. The Contract Specialist evaluated the price factor, finding Halvik's price fair and reasonable. AR 245-47. The Technical Evaluation Panel evaluation first involved three members of the Technical Evaluation Panel conducting a technical evaluation for each of the three offerors. AR 253-84. The Technical Evaluation Panel members assigned a high confidence, some confidence, or low confidence rating to the three non-price factors, noted the strengths and weaknesses of the proposals, and gave a consensus summary for the proposals. AR 253-84. After the three Technical Evaluation Panel members completed their evaluations for each offeror, the chair of the Technical Evaluation Panel wrote a memorandum providing the consensus rating for each offeror, as reflected in the following table, and listed five strengths that Halvik demonstrated. AR 249-50.

Technical Evaluation Panel's Memorandum - Consensus Rating Table:

| [Offeror] | Factor 1 – Technical Capability Statement | Factor 2 – Staffing Approach | Factor 3 – Corporate Experience |
|---|---|---|---|
| Halvik | High Confidence | Some Confidence | High Confidence |
| Harmonia | Some Confidence | High Confidence | Some Confidence |
| [***] | Some Confidence | Low Confidence | Low Confidence |

AR 250.

Technical Evaluation Panel's Memorandum – Halvik's Five Strengths:

1. Offered an appropriate agile approach and demonstrated an understanding of the need to develop and reconfirm the product backlog with the Office of the Chief Information Officer and the Federal Railroad Administration.
2. Uniquely among offerors, demonstrated an understanding of DOT information technology change management processes and their impact on project management.
3. Uniquely among offerors, demonstrated familiarity and experience with key shared services technologies in use (Tableau, Socrata, Drupal) within the DOT information technology environment.
4. Emphasized an approach that included test automation and maximizing such approaches.
5. Uniquely among offerors, provided three (3) highly relevant and recent corporate experiences [which] were directly relevant to the tasks outlined in the solicitation, the information technology environment in use to support the solicitation, and the data that will be processed.

AR 250-51.

The chair of the Technical Evaluation Panel recommended that the Source Selection Authority award the task order to Halvik.  AR 249-52.

    Finally, the Source Selection Authority wrote a Source Selection Decision Memorandum, dated December 1, 2022, which analyzed the Technical Evaluation Panel's Memorandum and concluded that the Technical Evaluation Panel's evaluation was reasonable.  AR 242-48.[9]  Like the Technical Evaluation Panel's Memorandum, the Source Selection Authority's Source Selection Decision Memorandum noted Halvik's five strengths, however, it also noted two of Harmonia's weaknesses.  AR 247.  Discussing Harmonia's weaknesses, the Source Selection Decision Memorandum stated:

> The Harmonia technical approach/quotation has notable weaknesses.  These include, but are not limited to:
>
> A lack of demonstrated experience within DOT and a lack of demonstrated experience with shared services environments (to include environment management and coordination with shared services providers).
>
> While the technical approach discusses a work share for Tyler Technologies resources, which can help mitigate the contractor's performance risk, it does not detail how those hours will be allocated in the staffing approach and does not address these hours in its pricing approach.  Therefore, the government cannot be assured that the Tyler Technologies resources will be meaningfully or effectively engaged.

AR 247.

---

[9] The Source Selection Authority attached the Technical Evaluation Panel's Decision Memorandum and the three technical evaluators' forms for each offeror to the source selection. *See* AR 245-47, 249-74; Def.'s Resp. at 5.

The Source Selection Decision Memorandum included the "Integrated Evaluation Results from Quot[ation]s" in the following table:

| [Offeror] | Non-Price Factor 1 Rating | Non-Price Factor 2 Rating | Non-Price Factor 3 Rating | Price |
|---|---|---|---|---|
| **Halvik** | High Confidence | Some Confidence | High Confidence | $498,814.00 |
| **Harmonia** | Some Confidence | High Confidence | Some Confidence | [***] |
| **[***]** | Some Confidence | Low Confidence | Low Confidence | $498,576.00 |

AR 246.

The Price Analysis was also summarized:

|  | Independent Government Cost Estimates | Halvik | Harmonia | [***] |
|---|---|---|---|---|
| **CLIN 00001** | | | | |
| Total Price - Labor Categories | $504,244.60 | $498,814.00 | [***] | $498,576.00 |
| Total Evaluated Price Inclusive of FAR 52.217-8 | N/A | $748,221.00 | [***] | $747,864.00 |
| | | | | |
| **Percentage Change compared to Independent Government Cost Estimates** | | [***] | -26% | [***] |
| **Percentage Change compared to Average Bid Price** | | [***] | [***] | [***] |
| Average Bid Price | | [***] | | |
| Median | | [***] | | |

AR 246.

Describing the prices proposed, the Source Selection Decision Memorandum noted that all the prices proposed were lower than the Independent Government Cost Estimate. It specified that "[t]he prices proposed by Halvik and [[***]] are 1% lower when compared to the [Independent Government Cost Estimate] and the price posed by [Harmonia] is about 26% lower." AR 246. Despite Halvik's price being the highest of the three offerors and despite Harmonia's price being significantly lower than the Independent Government Cost Estimate than Halvik's was, the Selection Source Authority noted that Halvik's "price is essentially equal to the second highest price and one percentage lower compared to the [Independent Government Cost Estimate] price of $504,244.60" and that "[t]he combination of technically superior support by Halvik's proposal demonstrates unique features that are advantageous to the government, as

8

documented in the [Technical Evaluation Panel's] [M]emorandum, supports the best value to the government." AR 247.

### D. Post-award Contacts with DOT

On December 1, 2022, DOT notified Halvik that it was awarded the 12-month task order under the software engineering support BPA. AR 288-89. On January 26, 2023, [***] contacted DOT to ask if an award had been made. The next day, DOT informed [***] that the task order was awarded to Halvik. AR 323. Two and one-half months later, on April 10, 2023, Harmonia also emailed DOT requesting an update on the solicitation. AR 322. That same day, DOT replied stating that the task order was awarded to Halvik. AR 322. Harmonia then asked DOT "when the award was made and why [Harmonia] w[as] not notified of it" as well as for an explanation of the award. AR 321. A few days later, DOT sent Harmonia a two-page "explanation of the basis for the award decision." AR 328-29. The explanation represented that Halvik provided the best value to the government and included a non-exclusive list of four of Harmonia's weaknesses. AR 328-29. It included:

1) A lack of demonstrated experience [***].

2) Described "[***]" without explaining what that meant.

3) Did not demonstrate an understanding of [***].

4) While the technical approach discusses [***].

AR 328-29.

Harmonia filed its complaint and initial motion for preliminary injunction in this court on April 21, 2023.

Halvik is currently performing the contract. It has completed over 6-months of the 12-month contract and has been working on operations, maintenance, and modernization of FRA's websites. *See* Def.-Intervenor Halvik's Notice at 2. Between December 2022 and May 2023, Halvik spent around 55% of its effort on operations and maintenance work and the rest on modernization of the websites. *Id.* In May 2023, Halvik increased its operations and maintenance work to around 60-70% of its work under the contract. "Without Halvik's current [operations and maintence] work, DOT would not have the technical resources to fix problems with the websites as they occur and would not be able to publish their required safety data in a timely manner." *Id.*[10]

## STANDARDS FOR DECISION

### A. Jurisdiction

---

[10] For example, "[a]s part of Halvik's increased [operations and maintenance] work, it monitors the background Data Warehouse processes and existing [***] reports to ensure proper functionality. This effort and support are critical to ensuring that DOT publishes accurate and complete data on an ongoing basis." Def.-Intervenor Halvik's Notice at 2.

The Tucker Act vests this court with jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The plaintiff must establish jurisdiction by a preponderance of the evidence. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir. 1988)).

### B. Motion to Dismiss as Barred under Doctrine of Laches

When the doctrine of laches bars a claim the court dismisses the claim as untimely. *See Reilly v. United States*, 104 Fed. Cl. 69, 78, 81 (2012). The doctrine of laches is an equitable defense. *See Land Grantors in Henderson, Union, Webster Counties, KY v. United States*, 86 Fed. Cl. 35, 46-47 (2009).

### C. Motion for a Preliminary Injunction

In a bid protest, the court may award any relief that it considers proper, including injunctive relief. 28 U.S.C. § 1491(b)(2). "The function of [a] preliminary injuncti[on] . . . is to preserve the status quo pending a determination of the action on the merits." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984). When determining whether to grant a preliminary injunction, the court must consider: (1) whether the movant is likely to succeed on the merits, (2) whether the movant will suffer from irreparable harm if an injunction is not granted, (3) whether the balance of hardships to the parties tips in the movant's favor, and (4) whether the public interest favors injunctive relief. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). "Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). "No one factor, taken individually, is necessarily dispositive." *FMC Corp.*, 3 F.3d at 427. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (citation omitted).

## ANALYSIS

### A. Jurisdiction

The court has jurisdiction to hear this bid protest under the Tucker Act. 28 U.S.C. § 1491(b)(1). No party disputes the court's jurisdiction.

### B. Motion to Dismiss as Barred under Doctrine of Laches

Defendant-intevenor Halvik moves for the court to dismiss Harmonia's complaint as time barred by the doctrine of latches. The doctrine of laches "bars a claim when a plaintiff's 'neglect

10

or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party.'" *Land Grantors in Henderson, Union, Webster Counties, KY*, 86 Fed. Cl. at 47 (quoting *A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992)). Halvik contends that Harmonia's motion is barred by the doctrine of laches because Haromia unreasonably delayed filing its protest, which prejudiced Halvik and DOT. Def.-Intervenor Halvik's Resp. at 5-6. Harmonia contends that laches does not apply. Pl.'s Reply at 13-15.

The doctrine of laches does not bar Harmonia's claim because plaintiff's delay was not unreasonable.[11] Harmonia filed suit in this court within a couple weeks of DOT informing Harmonia that it awarded the contract to Halvik. AR 322; Compl. In addition, although Halvik argues that Harmonia should have known earlier because [***] contacted DOT to inquire about the status of the award months before Harmonia contacted DOT, *see* AR 323, Harmonia's failure to act earlier does not warrant applying laches in this case.

### C. Motion for a Preliminary Injunction

#### 1. Likelihood of success on the merits.

To qualify for a preliminary injunction, Harmonia must show that it is "more likely than not" to succeed on the merits of its claims. *See Revision Mil., Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012). On the merits, Harmonia needs to show that the government's award decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See also* 28 U.S.C. § 1491(b)(4).

An agency's procurement decisions are entitled to "'highly deferential' rational basis review," which requires "a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). The court should only overturn a procurement decision where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 (Fed. Cir. 2004)); *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 990 (Fed. Cir. 2018) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). An agency's decision can be found to lack a rational basis where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

---

[11] Halvik cites to *Reilly v. United States*, 104 Fed. Cl. 69 (2012) for example, to support its motion to apply laches and dismiss the case. Def.-Intervenor Halvik's Resp. at 9. In *Reilly*, the court held that laches applied because plaintiff knew the facts leading to his protest at least nine months before he filed suit in this court and the delay was unreasonable and caused defendant prejudice. *Reilly*, 104 Fed. Cl. at 78-79. The facts in this case differ from those in *Reilly*.

11

difference in view or the product of agency expertise.'" *Keeton Corr., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)). For the violation of regulation or procedure standard, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). To show prejudice, the challenger must show "that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

In this case, Harmonia contends that DOT's evaluation was arbitrary and capricious and that its best value determination of was arbitrary and irrational. Harmonia makes three claims to support its contention that the agency's evaluation was arbitrary and capricious: (1) DOT did not properly document its evaluation, (2) DOT applied unstated criteria in evaluating Harmonia's proposal, (3) DOT ignored information in Harmonia's proposal, assigning unwarranted weaknesses and failing to identify multiple strengths for which it credited Halvik. Pl.'s Mot. for Prelim. Inj. at 8-22.

(i.) Whether DOT's evaluation was arbitrary and capricious.

a. *Sufficiency of DOT's documentation of its evaluation.*

The first issue is whether DOT properly documented its evaluation. Harmonia claims that DOT did not properly document its evaluation because it is not evident what information DOT used to make its award decision. Pl.'s Mot. for Prelim. Inj. at 10. Harmonia also alleges that the Technical Evaluation Panel evaluators, the Source Selection Decision Memorandum, and DOT's 2-page explanation to Harmonia focused on different strengths and weaknesses for Harmonia's non-price factors. *Id.* For example, Harmonia emphasizes that the Technical Evaluation Panel evaluators recorded 13 weaknesses and 29 strengths for Harmonia, the Source Selection Decision Memorandum identified 2 nonexclusive weaknesses and zero strengths for Harmonia, and DOT's 2-page explanation to Harmonia included 4 weaknesses and zero strengths for Harmonia. *See id.*[12] In contrast, the government contends that DOT properly documented its evaluation. The government contends that each level of analysis summarized and adopted the preceding analysis. Def.'s Resp. at 9. Finally, defendant notes that the 2-page explanation that DOT gave to Harmonia was "to help Harmonia understand where its proposal fell short," including giving additional context for the ratings it received. *Id.* at 10.

Harmonia has failed to show that DOT insufficiently documented its evaluation. The Department of Transportation disclosed its evaluation at each step. The evaluation involved multiple steps and the subsequent levels of the evaluation incorporated and built upon the prior comments. For example, the Technical Evaluation Panel Chair's report summarized the Technical Evaluation Panel evaluators' consensus ratings. *See* AR 249-51, 253-84. In addition,

---

[12] Harmonia alleges that "[t]he only thing these evaluations have in common is the adjectival rating. Their factual underpinning is unclear at best and non-existent at worst." Pl.'s Mot. for Prelim. Inj. at 13.

the Source Selection Decision Memorandum discussed the prior analysis and built upon it, further documenting DOT's evaluation.  *See* AR 242-48.

        *b.*     *Whether DOT applied unstated criteria during its evaluation.*

        The second issue is whether DOT applied unstated criteria in evaluating Harmonia's proposal.  Harmonia contends that the two weaknesses that the Source Selection Decision Memorandum assigned to it were based on unstated evaluation criteria.  Pl.'s Mot. for Prelim. Inj. at 13.  First, the Source Selection Decision Memorandum assigned Harmonia a weakness for its "lack of demonstrated experience within [***] and a lack of demonstrated experience with [***] (to include [***])."  *Id.* at 14 (quoting AR 247).  Harmonia contends that in doing so, DOT applied unstated evaluation criteria under the Technical Capabilities Statement factor because it evaluated bidders based on their [***] experience, assigning Harmonia a weakness, and assigning Halvik a strength.  *See id.* at 15.[13]  Second, the Source Selection Decision Memorandum assigned Harmonia a weakness for not detailing in its Staffing Approach factor how it would [***] and for "[***] in its pricing approach."  *Id.* at 16 (quoting AR 247, 329).  Harmonia contends that in doing so, DOT applied unstated evaluation criteria under the Staffing Approach factor and the Pricing factor because it [***].  *Id.*  Defendant counters that DOT did not apply unstated evaluation criteria but instead considered intrinsic elements relevant to the factors and determined the scope of an evaluation factor.  Def.'s Resp. at 11.

        Harmonia has failed to show that DOT applied unstated criteria during its evaluation.  The Department of Transportation did not apply unstated evaluation criteria under the Technical Capability Statement factor, the Staffing Approach factor, or the Price factor.  Instead, DOT considered elements intrinsic to these factors.  *See Coastal Intern. Sec., Inc. v. United States*, 93 Fed. Cl. 502, 531 (2010).[14]  First, the Agency reasonably assigned Harmonia a weakness for its level of experience with [***] because this was intrinsic to Harmonia's operations and maintenance, including its transition-in strategy, under the Technical Capability Statement

---

[13] Harmonia also alleged that three of the five "best attributes" that the Technical Evaluation Panel chair attributed to Halvik related to its [***] experience.  Pl.'s Mot. for Prelim. Inj. at 14-15.

[14] "[A] [p]laintiff seeking relief 'on a claim that the agency used undisclosed evaluation factors . . . must prove that the government evaluated the proposals received on a *significantly different basis* than announced in the [s]olicitation and that [the] plaintiff has been prejudiced as a result.'"  *Coastal Intern. Sec., Inc.*, 93 Fed Cl. at 531 (quoting *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 471 (1997) (emphasis added)).  In addition, "the United States Court of Federal Claims has observed that 'a [s]olicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'"  *Id.* (quoting *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003).  Even more, "a procuring agency traditionally has been afforded 'great discretion in determining the scope of an evaluation factor.'"  *Id.* (quoting *Forestry Survs. and Data v. United States*, 44 Fed. Cl. 493, 499 (1999)).

factor. *See* AR 75.[15]  Second, the Agency reasonably assigned Harmonia a weakness for its lack of detail in its description of how [***] because this was intrinsic to Harmonia's Staffing Approach factor and Price factor.  *See* AR 247, 269, 329.

> c. *Whether DOT assigned unwarranted weaknesses to Harmonia or failed to identify its strengths.*

The third issue is whether DOT ignored information in Harmonia's proposal, assigning unwarranted weaknesses to Harmonia and failing to identify multiple strengths for which it credited Halvik.  Harmonia challenges two weaknesses assigned to it – one in the Source Selection Decision Memorandum and the other in the two-page explanation provided to Harmonia – arguing the weaknesses ignore substantive information in Harmonia's proposal.  Pl.'s Mot. for Prelim. Inj. at 17.  First, Harmonia again challenges that it was assigned a weakness in the Source Selection Decision Memorandum for its lack of "demonstrated experience [***] and a lack of experience [***])."  *Id.* at 17-18 (quoting AR 247).  Harmonia contends that DOT ignored its demonstrated experience with [***] because it discussed [***], in its proposal and because it mentioned [***] in its proposal.  *See id.*  Second, Harmonia challenges that it was assigned a weakness in the two-page explanation for failing to explain what T-shaped resources are.  *Id.* at 19.  In addition, Harmonia alleges that DOT failed to identify multiple strengths in its proposal for which it credited Halvik.  Harmonia contends that its proposal contained 1) information related to [***] and 2) experience with [***], for which Halvik was assigned strengths, but Harmonia was not similarly assigned strengths.  Pl.'s Mot. for Prelim. Inj. at 20-22.  The government contends that Harmonia was properly assigned weaknesses and that the agency properly considered factors that differentiated Halvik's and Harmonia's proposals.  Def.'s Resp. at 16-18.

Harmonia has failed to show that DOT unreasonably assigned weaknesses to it or failed to identify its strengths.  First, it was reasonable for the Agency to determine based on the evidence before it that Harmonia did not adequately or particularly address [***] and that Harmonia inadequately explained T-shaped resources.  The offeror has the responsibility of submitting "a well-written proposal with adequately detailed information that allows for meaningful review by a procuring agency."  *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009).  Harmonia's proposal stated, for example, that "[***]."  AR 189.  Harmonia's proposal also stated, for example, that [***]."  AR 187.  It is reasonable for DOT to have assigned Harmonia a weakness for its lack of specifics about [***].  It was also reasonable for DOT to have assigned Harmonia a weakness for not adequately [***] based on its limited explanation.

For these three reasons, Harmonia has failed to show that DOT's evaluation was arbitrary and capricious.

> (ii.) *Whether DOT's best-value determination was arbitrary and irrational.*

---

[15] Relatedly, DOT reasonably assigned Halvik a strength for its experience in this area. *See* AR 251.

Harmonia must "establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996). It contends that the agency's best-value determination was arbitrary and irrational because it was based on ratings that were flawed. Pl.'s Mot. for Prelim. Inj. at 23. Defendant counters that DOT's best value determination was not arbitrary and irrational, noting that the ratings were not flawed and that regardless, any alleged errors were not prejudicial because, based on the information in Harmonia's proposal, it likely would not have received a High Confidence rating. Def.'s Resp. at 19-20. Harmonia has failed to show flaws in the rating process and therefore that the best-value determination was arbitrary and irrational.

### 2. *Irreparable harm.*

To qualify for a preliminary injunction, Harmonia must show that it will suffer irreparable harm if the court does not grant its motion for a preliminary injunction. An irreparable harm is one for which there is no adequate legal remedy. *See Magellan Corp. v. United States,* 27 Fed. Cl. 446, 447 (1993). Monetary losses are not irreparable harm. *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001). In certain instances, the lost opportunity to compete may be an irreparable harm, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000); *Seattle Sec. Servs. Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000), but "[m]ere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury." *OAO Corp.*, 49 Fed. Cl. at 480.

Harmonia contends that if the court does not grant its motion for a preliminary injunction Harmonia would suffer irreparable harm from "being deprived of the fair opportunity to compete for this significant opportunity and the substantial profits derived" from it. Pl.'s Mot. for Prelim. Inj. at 24. Defendant contends that Harmonia has not alleged that it would suffer irreparable harm because 1) Harmonia focuses on what would happen if the court denied permanent injunctive relief, rather than preliminary injunctive relief and 2) Harmonia fails to fully allege that it would be denied the opportunity to compete. Def.'s Resp. at 21-22.[16]

Harmonia has not shown that it will suffer irreparable harm because it has not shown that that it was denied the opportunity to compete through an unfair competitive bidding process. *See supra* at 11-15. In addition, "[a]lthough the loss of a contract's total value is often found to be sufficient harm to support a permanent injunction in this court, at the preliminary or temporary injunction stage, the calculus is different. *See Actionet, Inc. v. United States*, No. 19-388C, 2019 U.S. Claims LEXIS 259, at *7-8 (Fed. Cl. March 29, 2019).

### 3. *Balance of hardships.*

---

[16] Defendant-intervenor Halvik avers that since any harm Harmonia alleges has been occurring since December 2022, Harmonia has failed to explain how this harm has now become irreparable. Def.-Intervenor Halvik's Resp. at 18-19.

15

To qualify for a preliminary injunction, Harmonia must show that the balance of hardships tips in its favor. This factor requires the court to balance the harm to plaintiff if the preliminary injunction were not issued and "the harm to the government and to the intervening defendant" if the preliminary injunction were issued. *See GEO Group, Inc., v. United States,* 100 Fed. Cl. 223, 229 (2011) (quoting *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006)).

Defendant contends that DOT was not required to notify Harmonia of the award to Halvik because the solicitation was for an order under an established BPA, rather than for an order establishing a BPA. Def.'s Resp. 21-22 (discussing FAR 8.405-3(c)(2)(iii)(A)).[17] The government also contends that it would be substantially harmed if the court issued a preliminary injunction because it would interfere with the government's critical operations, thereby decreasing railroad safety and increasing the risk of injury or death in the railroad system. *Id.* at 23.[18] Halvik contends that it would be harmed if the court issued a preliminary injunction because it will only have completed part of the contract award. Def.-Intervenor Halvik's Resp. at 20. "Allowing Harmonia's protest to proceed at this late date will force Halvik to have to prematurely terminate its employees working on the [c]all [o]rder, causing disruption and damages to Halvik." *Id.*

Harmonia has not shown that the balance of hardships tips in its favor. Any harm Harmonia would suffer is outweighed by a preliminary injunction's interference with the government's critical operations and impact on railroad safety and the disruption to Halvik more than 6 months into a 12-month contract.

   *4. Public interest.*

To qualify for a preliminary injunction, Harmonia must show that a preliminary injunction would serve the public interest. "[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Software Testing Sols., Inc.*, 58 Fed. Cl. 533, 538 (2003). At the same time, "a procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion." *Id.* (quoting *Aero Corp. S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997)).

---

[17] The government also argues that regardless of its lack of a requirement to notify Harmonia of its award to Halvik, the notice of the award to Halvik was available on USAspending.gov and the Federal Procurement Data System, which are public facing websites. Def.'s Resp. at 22.

[18] "Absent the technical support currently provided by Halvik, the agency (specifically the FRA) would face 'significantly increased difficulties in providing continuous and uninterrupted safety oversight to the national's rail system.' [At the time this declaration is written] FRA's new safety data website [***]. The agency requires uninterrupted contractor support to resolve these operational issues and outages. Indeed, 'in the absence of such support, the [g]overnment anticipates the new secure safety data site would [***]." Def.'s Resp. at 23-24 (quoting Decl. of Dan Morgan ¶¶ 9, 11) (May 31, 2023)).

Harmonia contends that a preliminary injunction would serve the public interest because the agency's evaluation and award were unreasonable.  Pl.'s Mot. for Prelim. Inj. at 27.  In addition to the agency's evaluation and award, plaintiff points to the agency's delayed notification of its award to Halvik.  *Id.*  Plaintiff contends that "[t]he public has zero interest in allowing agencies to greenlight performance for more than a month while failing to provide notice to unsuccessful offerors, and it has no interest in allowing federal agencies to bypass the protest process."  *Id.*  Defendant contends that preliminary injunctive relief would not serve the public interest because DOT's award was not arbitrary or capricious and because the public interest is served by FRA providing uninterrupted access to critical transportation safety data which in turn can be used for emergency orders, safety advisories, regulations, and other measures to further safety in the rail industry.  Def.'s Resp. at 25.

In the circumstances at hand, a preliminary injunction would not serve the public interest because Harmonia has not shown that DOT's award was arbitrary and capricious and because the public interest is served by the government's website providing and promoting the use of critical safety data.  "Without Halvik's current [operations and maintence] work, DOT would not have the technical resources to fix problems with the websites as they occur and would not be able to publish their required safety data in a timely manner."  Def.-Intervenor Halvik's Notice at 2.

## CONCLUSION

Defendant-intervenor's motion to dismiss and plaintiff's motion for a preliminary injunction are both DENIED.  The court directs the parties to file a proposed schedule for further proceedings in the case.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge